IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DOROTHY CARR,                          :

   Plaintiff,                         :

v.                                     :        Civil Action No. GLR-17-244

MARYLAND GROCERY STORE                 :
COMPANY,
                                       :
  Defendant.

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Maryland Grocery Store Company's ("Giant Eagle") Motion for Summary Judgment (ECF No. 34). This employment disability discrimination and retaliation action arises from Giant Eagle's termination of Plaintiff Dorothy Carr's employment in the summer of 2014. The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons that follow, the Court will grant Giant Eagle's Motion.

## I.      BACKGROUND[1]

Maryland Grocery Store Company is a Pennsylvania-based retail grocery chain that operates two supermarkets under the trade name Giant Eagle in Frederick, Maryland. (Compl. ¶ 7). On March 26, 2006, Giant Eagle hired Carr to work as a part-time cashier at one of its Frederick, Maryland stores. (Carr Dep. 85:9–15, Jan. 29, 2018, ECF No. 34-2).

---

[1] Unless otherwise noted, the facts outlined here are set forth in Carr's Complaint (ECF No. 1). To the extent the Court discusses facts that Carr does not allege in her Complaint, they are uncontroverted, and the Court views them in the light most favorable to Carr. The Court will address additional facts when discussing applicable law.

Carr worked at that store, in jobs of increasing responsibility, until June 24, 2014, when she was terminated. (Carr Dep. 157:12–22; Herndon Dep. 182:19–184:11, Jan. 30, 2018, ECF No. 34-4).[2] From 2006 to 2011, Giant Eagle promoted Carr several times, including to full-time Front End Coordinator and ultimately to Front End Assistant Team Leader ("Assistant Team Leader"). (Carr Dep. 88:1–89:15). As Assistant Team Leader, Carr supervised approximately forty employees and oversaw front-end operations, which included scheduling, training, customer service, maintenance of the store, and driving financial performance. (Carr Dep. 98:5–102:6, 108:15–17; Carr Dep. Ex. 2, ECF No. 34-2 at 148–50 ("Carr Job Description"); Hines Dep. 15:21–17:3, Jan. 31, 2018, ECF No. 34-3).

During Carr's employment with Giant Eagle, she took medical leave three times: (1) from December 7, 2009 through March 14, 2010; (2) from April 17, 2011 through June 8, 2011; and (3) from August 16, 2012 to November 26, 2012. (Carr Dep. 164:14–66:11). During the 2012 leave, she underwent testing and surgery for what was ultimately diagnosed as leukemia. (Compl. ¶ 12; Carr Dep. 169:18–170:1; Carr Dep. Ex. 9, ECF 34-2 at 159 ("Attending Physician Statement")). Carr returned to Giant Eagle in November 2016 with no work restrictions, (Compl. ¶ 12; Carr Dep. 171:16–172:1, Ex. 10), after Carr told her doctors not to impose any so she could return to Giant Eagle without issue, (Compl.

---

[2] According to the Complaint, Giant Eagle fired Carr in July 2014, (Compl. ¶ 24). According to Carr's Termination Letter, the date was June 25, 2014. (Carr Dep. Ex. 6 ["Termination Letter"] at 155). The Court will use the June 24, 2014 date.

¶ 12). As with her previous two leaves, Carr returned to Giant Eagle in the same position, with the same pay and benefits as when she left. (Carr Dep. 170:2–8).

Within days of her return in late 2012, Carr received criticism for her job performance. Steve Hines, the Store Leader, requested that she change the prices on certain groceries. (Carr Dep. 177:18). Carr sought the price gun from another employee, Diane Gordon, and when Gordon said she would handle the task herself, Carr went to lunch. (Carr Dep. 178–180:9). When Carr returned from lunch, Hines rebuked her in front of customers and fellow employees for not completing the task. (Carr Dep. 180:10–13; 181;12–17). This upset Carr, (Carr Dep. 180:5–182:14), and therefore, on November 30, 2012, she called Giant Eagle's ethics hotline to complain about Hines. (Carr Dep. 174, 195–96; Carr Dep. Ex. 11, ECF No. 34-2 at 161 ("Ethics Hotline Report")). During the call, Carr noted she had been away from work for three months "due to being diagnosed with leukemia" and that when she returned to work Hines "yelled at her in front of customers and was rude to her" and that she was "treated as if she was not wanted back." (Ethics Hotline Report). Giant Eagle Human Resources Manager, Lorraine Herndon, received the complaint and investigated, including speaking with Hines, at which point Hines "knew he was wrong for confronting [Carr] on the sales floor." (Herndon Dep. 107:7–108:19).

In an email Carr said she sent to Hines in early 2014, Carr requested fewer evening shifts because they were "hard on me" but did not explicitly mention her health condition or disability. (Carr Dep. 113:7–115:16). Carr said this was the only "accommodation" request she made. (Id. 120:5–8). Carr said she told Hines she took her chemotherapy pills on Saturdays, which made her dizzy and weak, but she did not request Saturdays off. (Id.

318:3–19). Carr kept complaining to Herndon and Herndon's supervisor, Kelly Green about Hines. (Id. at 306:19–311:8).

On May 27, 2013, Hines made a request to Giant Eagle's Human Resources Department, specifically Herndon, to place Carr on a Performance Improvement Plan (the "PIP"). (Hines Dep. 84:22–86:7; Hines Dep. Ex. 52, ECF No. 34-3 at 91–92 ("PIP")). The PIP request noted a pair of customer complaints about Carr in the previous three months. (PIP). The Human Resources Department approved the request, and on July 23, 2013, Hines presented the PIP to Carr. (Carr Dep. 204:20–206:2). The PIP identified three areas of improvement—customer focus, financial metrics, and follow-through—and set out expectations and required actions for each. (PIP). The top of the PIP said, "Follow-up meetings should occur every [thirty] days to discuss progress." (Id.).

Hines met with Carr three times over the next year to assess and discuss her progress on the PIP. (Carr Dep. 217:3–9). During the first meeting on September 27, 2013, Hines noted that Carr had been holding regular team meetings as directed but had not completed the "Skills for Success" activities for improving her customer. (Id. 217:15–219–7). On February 1, 2014, Hines and Carr met again. Carr noted increased efficiency in use of grocery bags, (Id. 222:9–22), and Hines offered further suggestions for improvement, (Id. at 223:1–8). Hines told Carr to record all results. (Id. 224:1–6). On May 12, 2014, Hines and Carr met for a third time about the PIP, this time with Herndon present. (Id. 227:3–6). On May 31, 2014, Hines requested that Carr's PIP be extended by thirty days. (Hines Dep. 113:19–114:7).

On June 8, 2014, Assistant Store Manager Ryan walked into the front manager's office and saw Carr completing a cashier safety training course. (Carr Dep. 139:14–140:5). After Carr said she was completing the course for a cashier, Ryan told her, "You know you shouldn't be doing that." (Id. 140:8–9). On June 10, 2014, Hines visited Carr's office and saw Carr sitting with another employee. (Id. 140:13–18). Carr said she was assisting the employee in completing his food safety course. (Id. 140:20–21).

Also on June 10, 2014, Carr spoke on the phone with one of Giant Eagle's owners, Jeremy Shapira, for more than an hour. (Id. 245:15–246:2). Carr had written other managers but received no response, so she forwarded her email to Shapira and two other members of his family. (Id. 244:17–245:18). Shapira offered to speak with her the next day on the phone, and they did. (Carr. Dep. 246:1–2; id. Ex. 18, ECF 34-2 at 180 ["Carr-Shapira Emails"]). Asked during her deposition what she discussed with Shapira, Carr said, "The treatment of Steve, from Steve on me, and how I felt with me being sick Steve wanted me to quit. He was harassing me, how it was an everyday thing. . . . I talked about everything with [Shapira] that day." (Id. at 247:7–12; see Carr-Shapira Emails).

On June 12, 2014, Ryan and Hines met to discuss the issue of Carr completing training for other employees. (Hines Dep. 123:15–21; Herndon Dep. Ex. 40 ["Hines Report"]). Hines investigated, wrote a report, and referred the matter to Giant Eagle's Human Resources and Loss Prevention departments, recommending Carr's termination. (Hines Dep. 123:21–124:9, 126:21–127:4; Hines Report).

A few days later, Herndon and Morgan Black, from the Loss Prevention Department, met with Carr, who admitted to completing the training for at least two

employees. (Carr Dep. 143:11–144:6). Carr said she knew her actions were wrong. (Id. at 147:11–13). But she said other managers—not Hines or Ryan, though—helped their employees complete the training. (Id. at 147:17–148:21).

Upon completing the investigation, Herndon and Black discussed the case with Herndon's supervisor, Green, (Herndon Dep. 181:6–181:17), who in turn brought the matter to Karen Priore, Director of Human Resources. (Herndon Dep. 182:19–183:5). During a phone call, Carr admitted to Priore that she was wrong to complete other employees' assessments. (Carr. Dep. 150:5 –17). On June 24, 2014, Carr was terminated. (Id. 157:16–22; id. Ex. 6, ECF No. 34-2 at 155 ["Carr Termination Letter"]).

On August 28, 2014, Carr and representatives of Giant Eagle participated in a hearing before the Unemployment Appeals Division seeking a determination of her unemployment benefits. (Pl.'s Opp'n, Ex. C, ECF No. 35-3).[3]

On January 26, 2017, Carr sued Giant Eagle. (ECF No. 1). In her three-Count Complaint, Carr alleges that: Giant Eagle regarded her as disabled and discriminated against her on that basis, in violation of the Americans with Disabilities Act as amended ("ADAAA"), 42 U.S.C. §§ 12112 et seq. (2018) (Count I); Giant Eagle discriminated against her on the basis of her actual disability, in violation of the ADAAA (Count II); and

---

[3] Carr produced a transcript of the August 28, 2014 unemployment benefits determination hearing weeks after the close of discovery. (Def.'s Reply at 1 n.1). According to the hearing transcript, the same person who transcribed the audio recording notarized it on March 14, 2018, the day before Carr filed her Opposition. (Pl.'s Opp'n Ex. C at 1, 21, ECF No. 35-3). Giant Eagle contends the hearing transcript creates no genuine issues of material fact for purposes of its Motion. Therefore, the Court will consider the hearing transcript, despite Carr's possible discovery violations for failing to supplement written discovery.

Giant Eagle retaliated against her in violation of the ADAAA (Count III). (Compl. at 9–14). Carr seeks declaratory and injunctive relief, in addition to compensatory and punitive damages, and her attorney's fees and costs. (Id. at 14–15).

On March 1, 2018, Giant Eagle filed its Motion for Summary Judgment. (ECF No. 34). On March 15, 2018, Carr filed an Opposition. (ECF No. 35). On April 5, 2018, Giant Eagle filed a Reply. (ECF No. 39).

## II.     DISCUSSION

### A.     Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**B.      Analysis**

**1.      Relevant Allegations/Claims**

As a preliminary matter, Giant Eagle argues that the Court should not countenance claims that Carr to states for the first time in her Opposition. To the extent that was Carr's intention, the Court agrees with Giant Eagle.

In her Opposition, Carr argues that Giant Eagle discriminated against Carr in three ways: (1) "it failed to accommodate her disability"; (2) "it tolerated and fostered an atmosphere of harassment motivated by her disability"; and (3) "it terminated her employment because of her disability and complaints about her treatment." (Pl.'s Opp'n at 13, ECF No. 35). The third "way" corresponds with the three Counts in Carr's Complaint; the first two "ways" do not. The Court declines to consider the first two ways for at least three reasons.

First, the United State Court of Appeals for the Fourth Circuit has held that "a plaintiff may not amend her complaint via briefing." Hurst v. District of Columbia, 681 F.App'x 186, 194 (4th Cir. 2017); Zachair, Ltd. v. Driggs, 965 F.Supp. 741, 748 n.4 (D.Md. 1997) aff'd, 141 F.3d 1162 (4th Cir. 1998) (plaintiff is "bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"). Because Carr did not move to amend her Complaint, Carr can only proceed with the claims if she pleads them in her Complaint.

Second, failure to accommodate is a separate claim from—with different elements than—the discrimination and retaliation counts set out in the Complaint.[4] Third, the same is true for Carr's hostile work environment claim. In Hurst, the plaintiff brought discrimination claims in her complaint, like Carr, but later tried to assert a hostile work environment claim. Hurst, 681 F.App'x at 194. The Fourth Circuit held that, because Hurst "did not set out a distinct claim based on hostile work environment[,] the district court did not err in declining to consider Hurst's extra theory, which was not properly pled." Id.

In sum, the Court concludes that Carr does not plead claims for failure to accommodate or hostile work environment in the Complaint, and therefore they are not part of Carr's case. The Court now turns to the claims Carr pled in her Complaint.

---

[4] To establish a prima facie case for failure to accommodate, a plaintiff must show: "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations." Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013) (quoting Rhoads v. Fed. Deposit Ins. Corp., 257 F.3d 373, 387 n.11 (4th Cir.2001)). These elements are different than those for disability discrimination and retaliation set out below. (See infra at 12, 19). Even if various parts of Carr's Complaint, in combination, would support a failure to accommodate claim, Carr could not proceed on that claim because the Fourth Circuit has rejected an analogous argument that "background allegations were sufficient to state a separate count for reasonable accommodation." Mason v. Wyeth, Inc., 183 F.App'x 353, 359 (4th Cir. 2006). The Fourth Circuit in Mason further concluded because the plaintiff "structured his . . . complaint to allege, via clearly delineated headings, three specific, enumerated counts," as Carr does here, "it did not fairly place [the defendant] on notice that [the plaintiff] was claiming that such accommodations would have allowed him to 'perform the essential functions' of his job, 42 U.S.C. § 12111(8), and that he intended to pursue a separate count for failure to accommodate." Id. The same logic applies here. The Court, therefore, will not construe the Complaint to state a claim for failure to accommodate.

### 2.     Disability Discrimination

Giant Eagle contends that Carr cannot make out a prima facie case of disability discrimination under the ADAAA and that, even if she can, she cannot prove that its reason for her termination was pretextual. Carr argues she can carry both of those burdens and that there exist genuine disputes of material fact that require a jury to resolve. The Court agrees with Giant Eagle.

There are two methods for proving intentional discrimination in employment: (1) through direct or indirect evidence of intentional discrimination, or (2) through circumstantial evidence under the McDonnell Douglas[5] three-step, burden-shifting scheme. See Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 572 (4th Cir. 2015) (applying framework from McDonnell Douglas, a Title VII case, to an ADA claim). Giant Eagle argues that Carr has not presented any direct evidence in this case and that the McDonnell Douglas framework applies here. Carr does not dispute those contentions. Accordingly, the Court will analyze her claims under the McDonnell Douglas framework.

Under the McDonnell Douglas framework, the plaintiff first must establish a prima facie case of discrimination. See McDonnell Douglas Corp., 411 U.S. 792, 802 (1973). Once a plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to present a legitimate, nondiscriminatory reason for the adverse employment action alleged. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)). If

---

[5] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973).

the defendant succeeds in doing so, this rebuts the presumption of discrimination the plaintiff's prima facie case raises. See Stokes v. Westinghouse Savannah River Co., 206 F.3d 420, 429 (4th Cir. 2000) (citing Burdine, 450 U.S. at 255 n.10).

The plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253 (citing McDonnell Douglas Corp., 411 U.S. at 804). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993). In the end, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir.1996) (first citing Burdine, 450 U.S. at 253; and then citing Hughes v. Bedsole, 48 F.3d 1376, 1384 (4th Cir. 1995)).

To establish a prima facie case of wrongful discharge under the ADA, Carr must show that: (1) "she was a 'qualified individual with a disability'"; (2) "she was discharged"; (3) "she was fulfilling her employer's legitimate expectations at the time of discharge"; and (4) "the circumstances of her discharge raise a reasonable inference of unlawful discrimination." Rohan v. Networks Presentations LLC, 375 F.3d 266, 272 n.9 (4th Cir. 2004) (quoting Haulbrook v. Michelin N. America, Inc., 252 F.3d 696, 702 (4th Cir. 2001)). Giant Eagle does not dispute, for the purposes of its Motion only, that Carr can establish the first two elements; it does dispute that Carr can prove the third and fourth

elements. The Court, therefore, will begin its analysis with whether Carr was fulfilling her employer's legitimate expectations at the time of her discharge.

Giant Eagle contends that Carr cannot show that she was fulfilling its legitimate expectations when she was terminated because Carr admitted to falsifying employees' training records. Carr counters that "issues of material fact exist" with respect to this element. (Pl.'s Opp'n at 17). The Court agrees with Giant Eagle.

Carr cannot prove she was fulfilling Giant Eagle's legitimate expectations when she was terminated. Among other things, Carr's job description required her to "[m]aintain a safe and clean environment to ensure health and OSHA [requirements] are met" and "[m]aintain accurate department records to ensure documentation of activities is available." (Carr. Dep. Ex. 2, ECF No. 34-2 at 148). This included ensuring the employees she supervised took the necessary food safety, cashier safety, and OSHA trainings. (Carr Dep. 128:14–131:2). In her Complaint, Carr avers that, "[a]s a manager, [she] was responsible to ensure that her direct reports completed the [online OSHA procedures training] module and the test." (Compl. ¶ 22). In her Opposition, Carr states, without a citation, that "[a]nother goal was to have 100% participation on the annual safety trainings, taken online." (Pl.'s Opp'n at 10). Giant Eagle's Standards of Conduct's "partial list of violations that may be cause of immediate termination" includes "[f]alsifying any reports or records, or providing false information." (Carr Dep. Ex. 4 ["Giant Eagle Standards of Conduct"], ECF No. 34-2). Carr acknowledged reading the Giant Eagle Employee Handbook, which includes the Standards of Conduct, (Carr Dep. 123:4–11), and that "any violation of the Company's Polices and Procedures can make me subject to various disciplinary actions up

13

to, and including, termination," (Carr Dep. Ex. 3, ECF No. 34-2 at 151 ("Carr Employee Acknowledgement").

Here, Carr admitted to Giant Eagle Human Resources employees that she completed trainings for at least two employees, Amani Forest[6] and Charlie Holden, who were not present when she did so. (Carr Dep. at 139:14–140:1; 143:21–144:20). In her deposition, Carr stated that Ryan saw her completing Forest's training and told her she should not be. (Id. 140:2–5). Carr also testified that two days later she helped another employee, David Whitefield, complete his food safety course. (Id. 140:13–141:14). Carr said Hines noticed her at the computer with Whitefield beside her and said that Whitefield should be doing the training. (Id. 140:13–18; 142:11–14). In the deposition, Carr admitted to completing the training for at least one other employee, Hadji Davis, (id. 144:21–145:1), and admitted to clicking the "I acknowledge" button at the end of the training for at least one other employee, Linda Washington, (id. 145:2–6). Asked during her deposition if she had admitted that she "knew [her] actions were wrong," Carr responded, "Yes, I did." (Id. 147:11 – 13).

To reach the 100% goal referenced in Carr's Opposition, in addition to helping employees "carve out time to do the training" and "understand the process," Carr "filled in their initials to show that they had finished the training" and "performed the quiz for them."

---

[6] The documents in this case contain various spellings of the Giant Eagle employees mentioned in this paragraph. The Court has simply chosen one of the offered spellings in each instance.

(Pl.'s Opp'n at 10).[7] "Facing a no-win dilemma, [Carr] chose obtaining the 100% participation that Hines wanted." (Id. at 11). Carr acknowledged reading the Giant Eagle Employee Handbook and therefore knew that violating the Giant Eagle Standards of Conduct by falsifying any records subjected her to termination. Carr's termination letter cited this violation as grounds for her termination. (Carr Termination Letter).

Nevertheless, Carr contends that even if completing other employees' trainings conflicted with Giant Eagle's written policies and her supervisors' instructions, she was still meeting Giant Eagle's legitimate expectations at the time of her termination because taking or finishing others' tests was "a widespread practice" that "had existed since she first started at the store." (Pl.'s Opp'n at 18). Carr asserts that someone else took her OSHA test for her when she was a cashier. (Unemployment Hearing at 41:12–13). Carr maintains that Hines told her to take tests in the pharmacy department. (Carr Dep. at 148, 270–71). Carr offers affidavits from two other employees, Rodney Dorsey and Michelle Hagan, who confirmed that the practice was widespread.[8] (Dorsey Aff. ¶ 5, ECF No. 35-1; Hagan Aff. ¶ 6, ECF No. 35-2). Carr also contends that Giant Eagle "forgave the other two [employees] who engaged in the same behavior, Michelle Hagan and Jessica Hagan." (Pl.'s Opp'n at 19).

---

[7] The Opposition cites to the transcript from Carr's Unemployment Benefits Determination Hearing, but that page does not mention a quiz. (Pl.'s Opp'n Ex. C at 59, ECF No. 35-3).

[8] In its Reply, Giant Eagle notes that Carr did not produce these affidavits during the discovery period. The Dorsey and Hagan affidavits are dated March 13, 2018—two days before Carr filed her Opposition. (Dorsey Aff.; Hagan Aff.). As with the unemployment hearing transcript, Carr should have produced these to Giant Eagle earlier, but the Court will consider them.

This Court has rejected this argument in the analogous context of a Title VII discrimination claim.[9] "That other employees engaged in misconduct while on the job, but were not terminated, is not evidence that [the plaintiff] met [her employer's] legitimate performance expectations." Johnson v. Merchs. Terminal Corp., No. ELH-16-838, 2017 WL 1546429, at *13 (D Md. Apr. 27, 2017) (citing King v. Rumsfeld, 328 F.3d 145, 150 (4th Cir. 2003). Rather, "such evidence, even taken as true, may only be probative of the fact that other employees were also failing to meet [the employer's] expectations." Id.

The same logic applies here. Even if, as Carr alleges, other supervisors were also completing employees' computer-based trainings regarding food and workplace safety, that does not prove that she was fulfilling Giant Eagle's legitimate expectations at the time of her termination. Carr, a veteran Giant Eagle supervisor, had acknowledged reading the Giant Eagle Standards of Conduct, including the consequences for violating company policies and procedures. Her job description required her to ensure compliance with OSHA and to maintain accurate records. Giant Eagle, therefore, had a legitimate expectation that a she would not complete various parts of her supervisees' safety trainings. Carr admitted as much in her Complaint, (Compl. ¶ 22), and further admitted that she knew taking other

_____

[9] To make out a Title VII discrimination claim, a plaintiff must demonstrate that: "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." Bonds v. Leavitt, 629 F.3d 369, 386 (4th Cir. 2012) (quoting Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 285 (4th Cir. 2004)). The first three elements of that claim and of the ADA wrongful discharge claim here are similar, and the third elements of the two types of claim are nearly identical. Compare Bonds, 629 F.3d at 386, with Rohan, 375 F.3d at 272 n.9.

employees' tests was "wrong," (Carr Dep. 147:11–13), a conclusion that is irreconcilable with meeting her employer's legitimate expectations. That other Giant Eagle employees fell short of those expectations, too, does not show that Carr was meeting them. Johnson, 2017 WL 1546429, at *13.

Because Carr cannot prove that she was fulfilling Giant Eagle's legitimate expectations at the time of her termination, she cannot make out a prima facie case of disability discrimination under the ADA.

Even if she could make out a prima facie case, including the disputed fourth element, she could not prevail on her ADA claims. Under the McDonnell-Douglas burden-shifting framework, the next step would be for Giant Eagle to present a legitimate, nondiscriminatory reason for terminating Carr. Reeves, 530 U.S. at 142. Giant Eagle's burden is only one of production, not persuasion. Id. In other words, Giant Eagle need only offer a lawful and valid reason for terminating Carr; it does not have to prove that the lawful reason was the real reason it terminated her. Giant Eagle can clearly carry that burden: Carr admitted to completing multiple employees' safety trainings for them, a falsification of company records which explicitly served as the basis for her termination.

Under the final step of McDonnell-Douglas, Carr would then have to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253 (quoting McDonnell Douglas, 411 U.S. at 804). Critically, Carr would have to prove "both that the [allegedly pretextual] reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr., 509 U.S. at 515. Here, Carr's supervisor, Hines, the person

she alleges treated her badly because of her disability, was not the one who terminated her. Hines only reported that Carr had completed other employees' trainings to Giant Eagle's Human Resources Department and recommended termination. It was Human Resources employees, not Hines, who undertook an investigation, including checking and comparing computer and timecard records, that confirmed Hines' report. (Herndon Dep. 170:16–172:2). A total of three levels of Human Resources employees—Herndon, Green, and then Priore, the department's director—reviewed the evidence and interviewed Carr, before concluding that Carr had, in fact, completed tests for other employees in violation of company policy. (Id. 179:19–181:17; 182:13–183:7). At that point, Giant Eagle terminated Carr's employment. (Id. 183:8–10). No reasonable juror could find, under those circumstances, that Giant Eagle's reason for terminating Carr was false. Anderson, 477 U.S. at 248.

In sum, Carr has identified no genuine dispute of material fact concerning whether she was fulfilling her employer's legitimate expectations at the time of her termination. Because Carr cannot prove that third element of her ADAAA discrimination claim, she cannot prove the ADAAA discrimination claims in Count I and Count II of her Complaint. Even if she could establish the third element, Carr could not prove that the reason Giant Eagle fired her was false. Thus, the Court concludes that there is no genuine dispute of material fact regarding Carr's ADAAA discrimination claims. Accordingly, the Court will grant Giant Eagle's Motion as to Counts I and II.

### 3.      Retaliation

Giant Eagle contends that Carr did not engage in protected activity, and that even if she did, it was not the but-for cause of her PIP or her termination as required under Fourth Circuit case law. Carr counters that she engaged in protected activity over her final eighteen months working for Giant Eagle and that doing so caused several adverse employment actions, including the PIP and her termination. The Court concludes that Carr did engage in protected activity, but that the protected activity was not the but-for cause of her termination.

To establish a prima facie case for ADA retaliation, Carr must show that: "(1) [s]he engaged in a protected activity; (2) [Giant Eagle] acted adversely against [her]; and (3) the protected activity was causally connected to the adverse action." Williams v. Balt. City Cmty. Coll., No. GLR-12-238, 2014 WL 4784320, at *5 (D.Md. Sept. 23, 2014) (first alteration in original) (quoting Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007)) (applying the Title VII retaliation factors from Holland to the plaintiff's ADA claims).

### a.      Protected activity

There are two kinds of protected activity under the ADA. Felix v. Sun Microsystems, Inc., No. JFM-03-1304, 2004 WL 911303, at *17 (D.Md. Apr. 12, 2004). First, the ADA prevents discrimination against any individual who has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). Carr did not make a charge or participate in an investigation before the ones related to this lawsuit, so this kind of protected activity is not

relevant in this case. The second kind protected activity, the kind at issue here, is when a plaintiff "opposed any act or practice made unlawful by" the ADA. Id. "Opposition activity encompasses the use of informal grievance procedures as well as the staging of informal protests and voicing of one's opinions in order to bring attention to an employer's discriminatory behavior." Felix, 2004 WL 911303, at *18. Raising concerns of generally unfair practices, by contrast, does not constitute protected opposition activity. Stroud v. Greystar Mgmt. Servs., LP, No. RWT 11CV721, 2014 WL 937366, at *3 (D.Md. Mar. 10, 2014) (citing Felix, 2004 WL 911303, at *19); see also Sajadian v. Am. Red Cross, 202 F.3d 260 (table), 1999 WL 1111455, at *1 (4th Cir. Dec. 7, 1999) (holding that plaintiff "failed to make out a prima facie case of retaliation" under Title VII because "[a]lthough she raised general concerns about her workload, hours, and denial of leave, there is no evidence that either the [defendant or recipient of the complaints] was aware that her complaints were based on an allegation of discrimination."). "[O]pposition activity be directed towards conduct by the employer that is unlawful under the particular statute in question." Felix, 2004 WL 911303, at *18.

In this case, Carr has put forth evidence that she engaged in protected activity on only one occasion: her lengthy phone conversation with one of Giant Eagle's owners, Jeremy Shapira, on June 10, 2014. Asked during her deposition what she discussed with Shapira, Carr said, "The treatment of [Hines], from [Hines] on me, and how I felt with me being sick [Hines] wanted me to quit. He was harassing me, how it was an everyday thing." (Carr Dep. 247:5–12; see Carr-Shapira Emails). By telling one of the owners of Giant Eagle that Hines wanted her to quit because of her illness, Carr was using an "informal grievance

procedure" and "voicing [her] opinions in order to bring attention to [her] employer's discriminatory behavior." Felix, 2004 WL 911303, at *18.

All of her other complaints fail to meet the ADA's definition of protected activity because they were not directed towards conduct by the employer that is unlawful under the statute. In her call to the Giant Eagle ethics hotline, Carr said she had taken leave from work due to her leukemia but she did not say Hines yelled at her for that reason. (Ethics Hotline Report). In early 2014, in what she later called the only "accommodation" request she made, (Carr Dep. 120:5–8), Carr asked Hines to schedule her for fewer evening shifts because they were "hard on me," but she did not state that the reason for her request was her cancer treatment or disability. (Carr Dep. 113:7–115:16). Carr said she told Hines she took her chemotherapy pills on Saturdays, which made her tired, but she did not request Saturdays off. (Id. 318:3–19). Carr said she complained to Human Resources about Hines, the only person she alleges discriminated against her, but she does not cite any complaint that stated Hines' actions were unlawful under the ADA. (Id. at 305:12–311:8). The response she received from Giant Eagle Human Resources employees does not indicate her complaints cited unlawful disability discrimination: "They told me that if [Hines] wasn't willing to work with me on my hours or whatever I requested that I should file [Family Medical Leave Act] papers and get something from my doctor." (Id. at 305:18–21). In sum, Carr's other complaints do not constitute protected activity, and therefore cannot be considered as part of her retaliation claim.

Carr's complaints depict a difficult work environment at the Frederick Giant Eagle store, but they are not evidence that Carr engaged in protected activity. Carr was sick, and

her boss, Hines, was unkind. But either because she wanted to prove she could still do the work or because she did not believe Giant Eagle would accommodate her, Carr did not explicitly ask for reasonable accommodations under the ADA. Because she did not do that and, in her complaints to Human Resources officials, did not allege that Hines' poor treatment of her was because she had requested accommodations under the ADA, all of her complaints, save for her complaint to Shapira, were not protected activity under the ADA.

The Court turns now to the second element of Carr's retaliation claim, an adverse action.

### b.    Adverse Employment Action

Giant Eagle concedes that both Carr's PIP and her termination were adverse employment actions. Because the protected activity must cause the adverse employment action, the protected activity must occur earlier than the adverse employment action. Because the Court concluded that the only protected activity Carr engaged in was her phone conversation with Shapira, the only adverse employment action the Court need consider is what followed that call. The Shapira call occurred well after Carr's PIP began, so the Carr's complaint to Shapira could not have precipitated the PIP. The only adverse employment action the Court will consider, therefore, is Carr's termination.

### c.    Causation

In order to prevail on her ADA retaliation claim, Carr must prove that her protected activity caused the adverse employment action. The Supreme Court has held that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." Villa v. CavaMezze Grill, LLC, 858 F.3d 896, 900 (4th

Cir. 2017) (quoting University of Tx. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2528 (2013)). In Staley v. Gruenberg, the Fourth Circuit applied "but-for" causation in a retaliation case under the ADA and Title VII. 575 F.App'x. 153, 156 (4th Cir. 2014). The Fourth Circuit has also held that in the context of an ADA discrimination case, the plaintiff must prove "but-for" causation. Gentry v. E. W. Partners Club Mgmt. Co. Inc., 816 F.3d 228, 235–36 (4th Cir. 2016) ("The only remaining question is whether the ADA's text calls for a 'but-for' causation standard. We hold that it does."). Further, the Fourth Circuit has held that if the employer made the employment decision adverse to the plaintiff with a mixed motive—that is, for both a discriminatory and a nondiscriminatory reason—then the employer is not liable. Davis v. W. Carolina Univ., 695 F.App'x 686, 688 (4th Cir. 2017). "In other words, causation requires disability to be more than a motivating factor: it must be the only motivating factor." Id. Based on this case law, the Court concludes Carr must prove "but-for" causation for her retaliation claim, Staley, 575 F.App'x. at 156, and that her complaint about disability discrimination must, therefore, be "the only motivating factor" in the decision to terminate her. Davis, 695 F.App'x at 688.

Here, Carr cannot prove that her phone conversation with Shapira was the reason that Giant Eagle terminated her. Carr spoke with Shapira on June 10, 2014—the same day Hines saw Carr completing a training for another employee and two days after Ryan saw her doing the same thing and had reminded her that she should not be completing other employees' computer trainings. As discussed above, after Hines conducted an initial investigation, he referred the matter to Giant Eagle's Human Resources department. Three Human Resources employees, including the department's director, compared the computer

training records with employees' shift time records, which confirmed what Hines and Ryan witnessed—Carr had completed other employees' computer trainings. The Human Resources officials also interviewed Carr, who admitted to having completed other employees' safety trainings. On that basis, falsifying company records, Giant Eagle terminated Carr.

Further, Carr presents no evidence that Shapira received her complaint negatively; in fact, in her deposition and in her email to him, she expressed gratitude for how he listened to her. (Carr Dep. 248:10–12; see Carr-Shapira Emails). Nor does Carr present any evidence that Shapira then spoke to the Human Resources officials who were investigating Carr. In his email to Carr on June 15, 2014, Shapira wrote, "I haven't been able to talk with Kelly [Shaw][10] or Larry [Reuss][11] but am going to in the next two days." (Carr-Shapira Emails). There is also no evidence, even if Shapira spoke with either Shaw or Reuss, that either of those people spoke with the Human Resources team involved in investigating and ultimately terminating Carr.

Even if there were such evidence, Giant Eagle terminated Carr for falsifying company records in violation of Giant Eagle's Standards of Conduct Policy. Carr agreed to her employer's Standards of Conduct, admitted she knew she was not supposed to complete other employees' safety trainings, and admitted she did so on multiple occasions. Giant Eagle therefore had a non-discriminatory reason to terminate Carr. Consequently,

---

[10] Shaw was Senior Front End Team Leader and Carr's immediate supervisor. (Hines Dep. 124:8–9; 186:22).
[11] Reuss was a Regional Business Manager Leader, which meant he supervised the Frederick store and others. (Hines Dep. 140:8–11).

even if Carr could prove that her complaint about disability discrimination figured in Giant Eagle's decision to terminate her, under the mixed-motive rule from <u>Gentry</u> and <u>Davis</u>, she still could not prove a claim for retaliation under the ADA.

In sum, the Court concludes that there is no genuine dispute of material fact concerning whether Carr's protected activity caused her termination. Because Carr cannot establish the third element of an ADAAA retaliation claim, she cannot prove Count III of her Complaint. As a result, the Court will grant Giant Eagle's Motion as to Count III.

## III.    CONCLUSION

For the foregoing reasons, the Court will grant Giant Eagle's Motion for Summary Judgment (ECF No. 34). A separate Order follows.

Entered this 29th day of March, 2019.


Very truly yours,

_____/s/_____
George L. Russell, III
United States District Judge